## In re CHARLES R. PARTRIDGE LUMBER CO.

(District Court, D. New Jersey.   July 31, 1914.)

1. BILLS AND NOTES (§ 330*)—FILING AGAINST BANKRUPT—CLAIM—ASSIGNMENT—BONA FIDE HOLDER.

Where a claim against a bankrupt on certain notes was duly filed, and then assigned, the notes became merged in the claim; and hence the assignee, was not a holder of negotiable paper, and could not be accorded the rights of a bona fide holder of the notes for value. •

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 794-804 : Dec. Dig. § 330.*]

2. BANKRUPTCY (§ 342½*) — REFEREE'S FINDING — CONFLICTING EVIDENCE — REVIEW.

A referee's finding on a question of fact, based on conflicting evidence involving questions of credibility, will not be disturbed by the court, unless there is most cogent evidence of mistake and miscarriage of justice.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 530;  Dec. Dig. § 342½.*]

3. CORPORATIONS (§ 414*)—ACTS OF AGENT—WANT OF AUTHORITY—AGENT TO SELL.

Where a special agent was employed by the president of a corporation to negotiate certain of the corporation's notes for cash, the agent had no express or implied authority to exchange the notes of the corporation for bonds of another company, nor was such act within the apparent scope of his authority.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1640-1646;  Dec. Dig. § 414.*]

4. CORPORATIONS (§ 414*)—AUTHORITY OF AGENT—NEGOTIATION OF NOTES—POSSESSION OF BLANK NOTES.

Where a special agent of a corporation was authorized to discount its notes for cash, the fact that the agent was intrusted by the president of the corporation with possession of blank notes signed by the president in the corporation's name was insufficient under the circumstances to lead

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

one dealing with the agent to believe that he had authority to purchase corporate bonds with such notes.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1640–1646; Dec. Dig. § 414.*]

5. CORPORATIONS (§ 426*)—ACTS OF AGENT—WANT OF AUTHORITY—RATIFICATION.

Where a special agent was authorized by the president of a corporation to dispose of certain of the corporation's notes, but the president had no knowledge that the agent had exchanged certain of the notes for bonds of another company until after the corporation became bankrupt, and the trustee also did not have such knowledge until after the bonds had been sold as a part of the bankrupt corporation's assets, the sale of the bonds by the trustee did not constitute a ratification of the agent's acts.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1596, 1702–1704, 1707, 1708, 1710–1716; Dec. Dig. § 426.*]

6. BANKRUPTCY (§ 314*)—ADMINISTRATION OF ESTATE—CONTRACT OF BANKRUPT'S AGENT—REPUDIATION—CONDITIONS.

Where a bankrupt's agent without authority transferred certain of the bankrupt's notes in exchange for bonds which the bankrupt's trustee sold as a part of the assets of the bankrupt, without knowledge of the agent's lack of authority, the trustee was entitled to repudiate the transfer subject to a return of the bonds by the trustee, if possible, or to permit the other party to the transaction to file an amended claim against the bankrupt's estate for their value.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 469–473, 478, 483–487, 489, 490; Dec. Dig. § 314.*]

In Bankruptcy. In the matter of bankruptcy proceedings of the Charles R. Partridge Lumber Company. On petition to review an order of the referee allowing the claim of Joseph M. Myers, assigned to Edgar C. Van Dyke, in part only. Claim disallowed in toto.

Hunt, Hill & Betts, William Hazen Peck, and Morris Douw Ferris, all of New York City, for claimant.

Edwards & Smith, of Jersey City, N. J., for trustee.

HAIGHT, District Judge. The claim in question was originally filed by one Joseph M. Myers. It is based on three promissory notes, aggregating in amount $10,000, alleged to have been made by the bankrupt company and dated May 6, 1912. Each note was payable to the claimant. The petition for adjudication was filed on May 8, 1912. The claim was filed on July 16, 1912. The trustee was elected on the same date. By an instrument dated August 28, 1912, and filed with the referee on November 7, 1912, Myers assigned the claim to Edgar C. Van Dyke, who had acted as his attorney in preparing and filing the proof of claims. On October 7, 1912, the trustee filed objections to the allowance of the claim. The referee allowed the claim to the extent of $500, and directed that the costs be paid in the same proportion as the amount of recovery bore to the amount of the original claim. It is on the claimant's petition to review this order of the referee that the matter is now before the court.

[1] The referee found that the notes in question were issued pursuant to a scheme to defraud the company, entered into between Myers and one E. H. Cohic, an alleged agent of the bankrupt. He al-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

lowed the claim to the extent of $500, upon the theory that Van Dyke was a bona fide holder of the notes for value, and that the consideration which he paid for them was $500. Holcomb v. Wyckoff, 35 N. J. Law, 35, 10 Am. Rep. 219. I think that if the referee's determination—that the notes as between the original parties were void or voidable—is correct, that he was in error in allowing the claim for any amount whatever. Van Dyke was not a holder of negotiable paper; he was the assignee of a debt alleged to be due to Myers from the bankrupt estate, and which had theretofore been filed and proved with the referee, before whom the bankruptcy proceedings were pending. The instrument of assignment purports to transfer "all that certain debt of $10,000 due and owing to me on three promissory notes * * * which claim has been duly filed with the referee in bankruptcy." It also recites the bankruptcy of the alleged maker. One of the notes bears no indorsement, and the payee's indorsement on the others is erased. The notes were therefore not negotiated. Negotiable Instruments Law N. J. (P. L. 1902, c. 184) § 30. If one holding negotiable paper of a bankrupt were permitted, by filing a claim based thereon and assigning the same to an innocent purchaser, to defeat the right of a trustee to assert defenses against the claim which he could have interposed had the claim not been assigned, it is not difficult to forsee what dangerous results might follow. None of the reasons which brought about the rules peculiar to negotiable instruments are present in such a situation as this. In addition the notes had ceased to be negotiable instruments; they had become merged in a general proved claim against the estate of a bankrupt. The assignee was therefore not a bona fide holder of a negotiable instrument in the usual course of business, in the sense that the equities existing between the original parties to the notes could not be asserted against him. As far as Van Dyke is concerned his rights are the same as Myers, and the validity of the claim must be determined as though it had not been assigned.

An examination of the facts is therefore necessary. The bankrupt company was engaged in the lumber business. In August, 1911, Mr. Partridge, president of the bankrupt company, employed a Mr. Cohie to sell certain stock, which Partridge owned, of the bankrupt company. He worked under that arrangement until December of that year, when he was elected secretary of the company, which position he held until the 26th of April, 1912. He then resigned and continued under the "original agreement" from that time until the petition in bankruptcy was filed against the company. He also appears to have been employed by Partridge in negotiating promissory notes of the company, and for that purpose was permitted on one or more occasions to carry around with him blank promissory notes of the company, signed by the president. On May 6, 1912, two days before the petition in bankruptcy was filed against the company, he claims to have delivered two of the notes, upon which the present claim is based, together with another note, to Myers in exchange for 15 $1,000 bonds of the Gates Coal & Coke Company, and agreed to deliver additional notes aggregating $7,500 the following day; that he then offered to deliver the note for $7,500 (being the remaining note upon which the claim is based), but that Myers

desired to have it split up in several notes of smaller denominations; that he accordingly retained that note (presumably as agent for Myers) for the purpose of having the several smaller notes signed by Mr. Partridge, which were then to be delivered to Myers. He claims that he was unable to see Partridge until after the petition in bankruptcy had been filed; that Myers then insisted upon the delivery of the $7,-500 note; and it was accordingly delivered to him. This was on May 9th, the day after the petition for adjudication was filed. It also appears that at the same time Myers delivered 15 additional bonds of the same company to Cohic for the latter's personal use. The consideration, if any, which passed for these seems to have been the extinguishment of a debt amounting to $600, which Myers owed Cohic. The bonds remained in Cohic's possession until about June 5, 1912, when he delivered them to the receiver, who later delivered them to the trustee. They were subsquently sold by the trustee, together with the other assets of the bankrupt estate, at a bulk sale.

Although the evidence is very persuasive that the transaction was fraudulent, I do not find it necessary to determine whether there was sufficient evidence (as counsel for claimant contend there was not) to justify the referee's conclusion in that respect, as the claim must be disallowed on another ground. The minutes of the company were not offered in evidence. There is no evidence to show that the president of the company was ever authorized by the board of directors to sign notes of the company, or to purchase these bonds or like property, or for that matter to negotiate the company's commercial paper. It is urged on behalf of the trustee that the failure to show this authority on the part of Mr. Partridge is fatal to the allowance of the claim. I will assume, however, without deciding, that the filing of the proof of claim, in the absence of proof to the contrary, has relieved the claimant of the necessity of proving that Partridge was duly authorized to negotiate and sign the company's negotiable paper, and that he had the requisite authority to authorize Cohic to purchase the bonds. Whitney v. Dresser, 200 U. S. 532, 26 Sup. Ct. 316, 50 L. Ed. 584. It is clear that the only instructions which Cohic received regarding what he was to do were given to him by Partridge. Mr. Partridge testified that he had never authorized Cohic to use the notes of the company for the purpose of obtaining the bonds in question, and never knew that Cohic was doing so, or had done so, until after the bankruptcy proceedings had been instituted, and that he gave the notes to Mr. Cohic in trust, to be discounted for cash "without paying an exorbitant rate of interest or discount." In this respect he is contradicted by Cohic, who testified that he had express authority from Mr. Partridge to use the notes for the purchase of these bonds.

[2] The finding of the referee that the transaction was fraudulent necessarily embodies the finding that Mr. Cohic's testimony in this respect was false. The finding of the referee was based upon conflicting evidence, involving questions of credibility, and the court should not disturb his finding, unless there is most cogent evidence of mistake and miscarriage of justice. Ohio Valley Bank v. Mack, 163 Fed. 156, 89 C. C. A. 605, 24 L. R. A. (N. S.) 184 (C. C. A. 6th Cir.). The evi-

dence clearly justifies this finding. Cohic's testimony is filled with contradictions and improbabilities, and is, I think, utterly unworthy of belief. Irrespective of the general rule above stated, I would have no hesitation in finding as a fact that Cohic, in exchanging the notes for the bonds, if he actually did so, exceeded his authority and abused the trust which had been reposed in him. Myers dealt with him as agent. The matter, therefore, presents a situation which calls for the application of the principles of agency.

The extent of the principal's liability for acts of an agent in matters of contract is thus clearly stated by Mr. Justice Depue in Law v. Stokes, 32 N. J. Law, 249, 251 (90 Am. Rep. 655):

"A principal is bound by the acts of his agent within the authority he has actually given him, which includes not only the precise act which he expressly authorizes him to do, but also whatever usually belongs to the doing of it, or is necessary to its performance. Beyond that, he is liable for the acts of the agent within the appearance of authority which the principal himself knowingly permits the agent to assume, or which he holds the agent out to the public as possessing. For the acts of his agent within his express authority the principal is liable because the act of the agent is the act of principal. For the acts of the agent within the scope of the authority he holds the agent out as having or knowingly permits him to assume the principal is made responsible because to permit him to dispute the authority of the agent in such cases would be to enable him to commit a fraud upon innocent persons. In whichever way the liability of the principal is established, it must flow from the act of the principal. And when established it cannot, on the one hand, be qualified by the secret instructions of the principal, nor, on the other hand, be enlarged by the unauthorized representations of the agent."

[3] Cohic was a special agent, and his authority was to negotiate the notes for cash, and Myers was bound to ascertain, at his peril, the extent of Cohic's authority. Dowden v. Cryder, 55 N. J. Law, 329, 26 Atl. 941; Milne v. Kleb, 44 N. J. Eq. 378, 14 Atl. 646; Owings v. Hull, 9 Pet. 607, 9 L. Ed. 246.

[4] As above stated, Cohic had no express authority to exchange the notes for the bonds, nor was that within his implied powers. The purchase of bonds was not necessary for the performance of what he was directed to do, namely, discount the notes for cash. Neither can it be said that it was within the apparent scope of his authority. The mere possession by an agent of blank notes of a lumber company (which Partridge apparently permitted him to have) would not lead one, dealing with the agent, to believe that he had been clothed with power to purchase bonds of a coal and coke company which had already defaulted in the payment of interest on the bonds, especially when, as in this case, Myers knew that the lumber company was in dire need of funds and was endeavoring to borrow. Many cases illustrating the tendency of the courts to strictly limit an agent's authority in dealing with the principal's negotiable paper are set out in 31 Cyc. 1381 et seq. Cohic testified that 15 of these bonds were given to him for a consideration not exceeding $600. This, presumably, was approximately their value. Of course the value of the 15 bonds which were purchased with the notes of the bankrupt company was the same. Myers must be presumed to have known, assuming that he was acting in good faith, that Cohic had no authority to exchange promissory notes of his principal,

215 F.—62

amounting to $15,000, for bonds worth only $600. It was therefore clearly his duty to have inquired as to Cohic's authority.

[5] The sole remaining question is whether the receipt, retention, and sale of the bonds by the trustee has the effect of ratifying Cohic's authorized act. Mr. Partridge testified that he had no knowledge of it whatever until after bankruptcy had intervened. The bankrupt company, therefore, did not ratify it.

[6] Accepting and retaining benefits obtained directly under an unauthorized contract of the agent, in order to work a ratification, must be based upon full knowledge by the principal of all the material facts of the transaction. Owings v. Hull, 9 Pet. 607, 9 L. Ed. 246; Bennecke v. Ins. Co., 105 U. S. 355, 26 L. Ed. 990; Gulick v. Grover, 33 N. J. Law, 463, 97 Am. Dec. 728; Titus et al. v. Cairo Fulton R. R. Co., 46 N. J. Law, 393; Clement v. Young-McShea Amusement Co., 70 N. J. Eq. 677, 67 Atl. 82, 118 Am. St. Rep. 747. If the above rule respecting ratification is applied to the trustee, I do not think that the receipt and sale of these bonds by him can be held to be a ratification of Cohic's act. As far as the evidence in the present case shows, neither the receiver nor the trustee, when the bonds were received, were advised of the material facts and circumstances attending the transaction. In fact, at the time Cohic delivered the bonds to the receiver he made a written statement to the effect that the transaction had been carried out with the approval and at the express direction of Mr. Partridge. The bonds were sold by the trustee, with the other assets of the company, in bulk, on August 19, 1912. He did not file objections to the claim until October 7, 1912, and apparently learned for the first time that the act was entirely unauthorized on March 27, 1913, at a hearing on this claim, when Mr. Partridge was a witness. His objection to the claim, of course, is a disavowal of the contract. Under these circumstances it will be presumed, in the absence of evidence to the contrary, that had the trustee known of the material facts and circumstances, he would not have accepted or disposed of the bonds. If the bonds were of any value whatever, the trustee should not, of course, be permitted to disavow the contract and also retain the bonds or their value. The evidence does not disclose satisfactorily whether or not the bonds were of any value. At any rate, the question of value was not the subject of inquiry before the referee. I will therefore not attempt to fix the value. It may also be that the trustee can secure possession and make delivery of the bonds to the proper person.

The order of the referee will be overruled and the claim totally disallowed. The claimant will be required to pay the costs of the proceeding before the referee. The trustee will be directed to return the bonds to the proper person within 10 days from the signing of an order, or, in the event of his inability to do so, the claimant or the assignee, as may be proper, will be permitted to file with the referee an amended claim for the value of the bonds, within 10 days, after being notified that the trustee is unable to make delivery of the bonds. The referee will be permitted to extend either time, in his discretion.